---

## THE GRID.[1]

(*District Court, S. D. Georgia.* May 1, 1884.)

SALVAGE—PILOTS ACTING AS SALVORS.
 The service rendered by pilots must be beyond their ordinary duties as pilots to entitle them to salvage; but where there is unusual and extraordinary risk incurred in rendering service to a vessel in distress, although it be but a pilotage service, courts of admiralty may give an additional compensation to encourage meritorious action in such cases.

In Admiralty.
*Robert Falligant*, for libelant.

[1] Reported by W. B. Hill, Esq., of the Macon bar.

*Chisholm & Erwin*, for claimant.

LOCKE, J. The libelant, Michael P. Usina, a pilot belonging to the port of Savannah, while returning from his cruising grounds outside the bar of that harbor, on the nineteenth of January, 1884, discovered, the Norwegian bark Grid coming up from the southward and running in, in the direction of Stone Horse shoal. He waved his flag and made what signals he could, but she kept on her course and soon struck. There was a strong southerly breeze, with a heavy sea, it breaking around and sometimes throwing the spray over her. Libelant came as near the bark as it was considered safe with his schooner, lowered his small boat, and boarded her with one man. While coming around under her bows, he shipped a sea that nearly filled his boat. The bark went ashore at low water, where the tide rises about five feet, and was pounding, and soon commenced leaking. Libelant ordered the anchor to be let go to prevent her dragging further upon the shoal, as the tide rose, and directed the bark's crew to keep pumping, which they did. As the tide rose the vessel floated, and the wind having come around to the westward, but having died out until it was too light to enable her to stem the rising tide, he piloted her through and over the shoals into Tybee roads. There was plenty of water, but she needed careful piloting. She was there taken in. tow by a tug and brought to the city. She was injured some and leaked badly, having about six feet of water in her when she reached the dock. When libelant left his pilot-boat he ordered her to send out a tug from Tybee, but before her arrival there the tug had learned of the bark's being aground and gone out. She was not able to come near enough to take a line, and did nothing until the bark reached Tybee, when she took her in tow.

The connection of a pilot with a vessel in distress, his duty towards her, and his right to extra compensation for efforts in her behalf, always raise delicate questions as to just how far his position as pilot demands his services, and when his labor as salvor begins. There are frequently cases where the services are so unmistakab'y salvage and not pilotage, that there is no difficulty in determining his rights; but in others the character of the service is not so distinctly marked, and its nature more difficult to determine. Where a vessel is discovered aground and is relieved from the bottom by a pilot and his crew by carrying out an anchor, making jettison of cargo, or heaving at windlass or capstan; or where a vessel is leaking badly and is kept afloat by a pilot's crew pumping; or service is rendered by working an abandoned vessel, or one whose crew are worn out or disabled by sickness, and the vessel is in danger,—there can be no question but what such service would be one of salvage rather than pilotage, and that he would be entitled to compensation as such; but when the labor performed and service rendered consist only of such acts as the duty of a pilot demands, notwithstanding the fact that the vessel is in distress, or his exposure is unusual and the risk incurred more than

ordinary, it is against public policy to construe it as salvage; but, whenever unusual compensation appears to be demanded, it is given as extra pilotage.

The peculiar knowledge required of a pilot is as to the depth of water, and the rise, time, and strength of the tides; and where these items of knowledge only are used, or orders given based upon them, it can at no time be considered more than pilotage service. It is also the duty of a pilot at any time, in order to prevent a vessel in his charge from grounding, to let go an anchor; nor could such an act be considered beyond what might be demanded of him as pilot, or entitle him to extra reward. Nor can danger in boarding a vessel be taken into consideration, when unattended by other peculiar circumstances, to give salvage compensation, as it is in the worst weather that his services are the most required and demanded, and his duty becomes most imperative.

In this case, had the libelant reached the bark while she was approaching, or even while in the breakers, but before she had struck, and by correct and timely orders succeeded in extricating her from the difficulty with a skillful use of the sails and helm, can it be claimed that he would have been entitled to extra compensation because he had encountered danger in boarding her, or on account of the little water under her keel? I think not; for if such questions could be successfully raised in such a case there would be no end to demands on account of the severity of the weather, or the danger encountered in such services, or the shoalness of water, and danger of the vessel on such account, and any fixed rates of pilotage would be useless. The vessel when boarded was not afloat, and could not at that time be piloted; neither the libelant nor the man with him did any labor in extricating her from the bottom or in pumping, but his knowledge of the rise and direction of the tide, as pilot, enabled him, by ordering the anchor let go, to hold her in her position until the tide floated her, when his labors as salvor, if he could by any possible construction ever be so considered, ceased, and he became a pilot. There can be no question as to this. Had he found the vessel safely anchored at high tide in the place from which he piloted her, it could not be claimed that he was doing more than his duty as pilot in piloting her in; no more could it because he was on board before. But the vessel was aground in a dangerous place, and the weather bad; the evidence shows conclusively that the risk in boarding her was extraordinary and unusual; and the promptness and readiness to go to her aid praiseworthy, and entitled to recognition.

In *The C. D. Bryant*, 19 Fed. Rep. 603, which has been cited by claimant, the facts seem nearly similar, with the exception that in that case Judge Deady did not consider that the libelant incurred even the ordinary danger of a pilot service, while in this case it was certainly considerable and unusual, although perhaps not greater than is occasionally but not frequently met in boarding vessels at

sea in tempestuous weather. In that case the libel was dismissed with costs, but in this, I think, the difference in the state of the weather and sea, and consequently the risk incurred, will justify a different decree. The bark was in ballast; her expenses, port charges, and repairs something over $7,000; her value when repaired from ten to twelve thousand dollars, according to the demands of the market; leaving the net value saved from three to five thousand dollars. The libelant has presented a claim for pilotage, and been paid in full, and a tug paid extra towage from Tybee. The claimant has made a tender of $250, and deposited that amount in the registry of court. I consider that amount will amply compensate for the extraordinary risk incurred, and that it is sufficient to encourage to like exertions under similar circumstances.

There will be a decree in favor of the libelant for $250, and the costs incurred prior to the time of the deposit; subsequent costs to be deducted from the money on deposit, and the residue paid him.